IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | HONORABLE JEROME B. SIMANDLE |
| v. | Criminal Action No. 14-699 (JBS) |
| TOYE TUTIS, KABAKA ATIBA, and JAZMIN VEGA, | **OPINION** |
| Defendants. | |

APPEARANCES:

Diana Vondra Carrig, Assistant U.S. Attorney
Howard Weiner, Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
401 Market Street
Camden, NJ 08101

Dennis J. Cogan, Esq.
Christopher D. Warren, Esq.
COGAN PETRONE & ASSOCIATES
2000 Market Street, Suite 2925
Philadelphia, PA 19103
      Attorneys for Defendant Toye Tutis

David S. Rudenstein, Esq.
9411 Evans Street
Philadelphia, PA 19115
      Attorney for Defendant Kabaka Atiba

Troy A. Archie, Esq.
21 Route 130 South
Cinnaminson, NJ 08077
      Attorney for Defendant Jazmin Vega

**SIMANDLE, Chief Judge:**

## Table of Contents

I. INTRODUCTION ............................................... 2

II. FACTUAL AND PROCEDURAL BACKGROUND .......................... 4

  A. General Case and Investigation Background ................ 4

  B. State Wiretap Authorizations ............................ 6

  C. December 9, 2014 Search Warrants, December 10, 2014
  Indictment, and Arrests .................................. 12

III. SEVERANCE MOTION OF KABAKA ATIBA ......................... 14

  A. Standard of Review Applicable to Severance .............. 14

  B. Defendant Atiba Has Not Demonstrated the Need for Severance
  17

IV. SUPPRESSION MOTION OF TOYE TUTIS ......................... 22

  A. Defendant Tutis' Request for Suppression ................ 24

    1. Standard for Suppression ............................. 24

    2. The Wiretap Evidence Will Not Be Suppressed ........... 26

  B. Defendant Tutis' Request for a Franks Hearing ........... 30

    1. Standard for a Franks Hearing ........................ 30

    2. Defendant Has Not Made the Substantial Showing Necessary
    to Obtain a Franks Hearing ............................. 32

V. CONCLUSION ............................................... 34

## I.    INTRODUCTION

The Indictment herein arises from a long-running
investigation into an allegedly large scale drug trafficking and
money laundering organization.  More specifically, the
Indictment, filed December 10, 2014, charges Defendants Toye
Tutis (hereinafter, "Defendant Tutis" or "Toye Tutis" or "Toye")
and Kabaka Atiba (hereinafter, "Defendant Atiba"), among others,

with conspiring to distribute kilogram quantities of heroin and cocaine throughout southern New Jersey.[1] [See generally Docket Item 1.]

As the May 23, 2016 trial date approaches, Defendant Tutis now moves to suppress wiretap evidence, on the grounds that the authorization entered by a New Jersey state court on September 26, 2014 issued without probable cause, and rested upon an affidavit that contained material factual omissions.[2] [See generally Docket Item 234.] Defendant Atiba, in turn, seeks to sever his trial from that of the remaining co-defendants, based upon his belief that the two indicted offenses lack any transactional relationship, and because a joint trial would purportedly cause substantial prejudice to his interests. [See generally Docket Item 222.] The Government opposes both motions for lack of merit.[3]

---

[1] Count I specifically charges Toye Tutis, a/k/a "Ahmad," a/k/a "Mahd," a/k/a "Santana," Kareem Taylor, a/k/a "K-Love," a/k/a "Love," Ivan Cuellar Naranja, a/k/a "Fatboy," a/k/a "Cirilo Ruiz," Francisco Alberto Rascon-Muracami, a/k/a "Francisco Alberto Rascon-Murakami," Phillip Horton, a/k/a "Phil," a/k/a "Doc," Tozine Tiller, a/k/a "To," Talib Tiller, Kabaka Atiba, Ronald Douglas Byrd, a/k/a "Doug Byrd," and John Wellman, a/k/a "Yah-Yah," a/k/a "Yah."
[2] Defendants Atiba and Jazmin Vega join in Defendant Tutis' suppression motion. [See Docket Items 214, 244, & 247.]
[3] Defendants filed no reply briefs.

For the reasons that follow,[4] Defendant Tutis' motion to suppress and Defendant Atiba's motion for severance will be denied.[5]

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    General Case and Investigation Background

The charges contained in the Indictment stem from a long-running investigation conducted jointly by federal, state, and local law enforcement officers, targeting an alleged drug-trafficking organization in Atlantic City and the surrounding southern New Jersey region. (See Walsh Aff. at ¶¶ 5-6.)  The fruits of this investigation purportedly revealed, overall, that Defendant Tutis sourced supplies of heroin and cocaine from the Mexican Sinaloa cartel (with the help of alleged cartel broker, Defendant Ivan Cuellar Naranjo), through contacts in Los Angeles, California, and relied upon his network of alleged drug-traffickers in this region (namely, Defendants Tozine Tiller, Jewell Tutis, and Atiba, among others) to distribute and sell the drug products. (See id. at ¶¶ 6-7.)  Defendant Tutis, with his "paramour" Defendant Jazmin Vega, then allegedly

---

[4] The Court conducted oral argument relative to the pretrial motions of all defendants on February 24, 2016. [See Docket Item 256.]

[5] On the hearing record of February 24, 2016, the Court reserved decision on Defendant Tutis' motion to suppress, and denied Defendant Atiba's motion for severance.  The foregoing Opinion provides the reasoning for this Court's denial of Defendant Atiba's motion for severance, as well as the disposition of Defendant Tutis' suppression motion.

"launder[ed]" the proceeds of this drug conspiracy through cash deposits into various bank accounts, high-end purchases, and by comingling the drug-trafficking proceedings with the proceeds of his legitimate business (namely, Ta'Ja Construction, LLC, Ta'Ja Construction I, LLC, Real Estate Investors, LLC, Ta'Ja Laundromat, Dave's Grocery, and Integrity Heating & Cooling, LLC).  (Id. at ¶¶ 7-9.)

During the course of the investigation, state and federal law enforcement officials learned of the nature of the alleged drug-trafficking conspiracy through a series of drug purchases (namely, controlled buys by confidential sources), package intercepts, trash pulls, authorized property searches and seizures, as well as court authorized "roving wiretaps" of telephones known to be used by various defendants.  (Id. at ¶¶ 10-11.)  Indeed, the genesis of the electronic-surveillance aspect of this case dates back to an initial federal wiretap obtained on November 21, 2013, and supported by a probable cause affidavit that identified a number of "'target interceptees,'" including Tozine Tiller and Toye Tutis.[6]  (Tutis Br. at 1-2; see also Gov'ts Opp'n at 6.)

---

[6] Defendants mount no challenge to the propriety of the various federal wiretaps.

### B.   State Wiretap Authorizations

As relevant here, the Atlantic County Prosecutor's Office (hereinafter, the "ACPO") obtained a series of wiretaps, authorized by the Honorable Bernard E. DeLury (hereinafter, "Judge DeLury") and supported by the affidavits of Detective Jason E. Dorn (hereinafter, "Detective Dorn"), on cellular telephones known to be used by Defendants Jewell Tutis, Toye Tutis, and Ivan Cuellar Naranjo.  (See Gov't Opp'n at 7; see also Dorn Sept. 19, 2014 Aff. (Gov't Ex. 2); Dorn Sept. 26, 2014 Aff. (Gov't Ex. 3).)

On September 19, 2014, the ACPO obtained its first "roving" wiretap authorization (BED-ATL-21-WT-2014) to intercept communications over the cellular telephone of Jewell Tutis (609-626-4283) (hereinafter, the "Jewell wiretap").  (See Gov't Ex. 2.)  In support of this initial authorization, Detective Dorn informed Judge DeLury of the federal wiretaps targeted at Toye Tutis (among other investigative techniques used in relation to Defendant Tutis), and explained that an ongoing investigation into Toye Tutis had identified Jewell E. Tutis as "an operator/partner of an ongoing criminal narcotics distribution organization."  (Dorn Sept. 19, 2014 Aff. at ¶¶ 11, 19.)  More specifically, the affidavit stated that a confidential informant

(hereinafter, "CI #607/CS-2")[7] had a conversation with Toye Tutis in July 2014, during which time Tutis advised CI #607/CS-2 that he could supply the individual with cocaine, marijuana, and heroin in an array of quantities. (Id. at ¶ 21.) Toye then purportedly instructed CI #607/CS-2 to refer to him as "'Santana'" over the telephone, and provided CI #607/CS-2 with "a series of code phrases"[8] to use when contacting his brother, Jewell, to purchase drugs. (Id.) CI #607/CS-2, in turn, met with Jewell, who reiterated that he and his brother, Toye, could provide narcotics, and other "'hardware.'" (Id. at ¶ 22.)

Following these initial exchanges, on August 5, 2014, Detective Dorn met with CI #607/CS-2 at a predetermined location "to place a recorded telephone call to Toye Tutis." (Id. at ¶ 23.) At that time, CI #607/CS-2 handed Detective Dorn a Ta'Ja Construction Real Estate Investor's LLC "business card" he

---

[7] The ACPO materials refer to this confidential source as CI #607, while the Government identified the same confidential source as CS-2. (See Gov'ts Opp'n at 12 n.8.) In order to avoid any ambiguity, this Court will refer to the confidential informant by both identifiers.

[8] These phrases and their claimed meanings included: (1) "'come to work early,'" which meant that the confidential source needed additional drugs; (2) "'bring me a cup of coffee in the morning,'" which indicated that the informant needed marijuana, (3) "'[b]ring me a box of doughnuts in the morning,'" which meant that the source wanted an ounce of cocaine, and (4) a "whole 'bird,'" which indicated that the informant desired a kilogram of cocaine. (Dorn Sept. 19, 2014 Aff. at ¶ 21.)

claimed to have received from Defendant Tutis on August 4, 2014,[9] and on which someone had handwritten (on the back) "the name 'Jewel' and a telephone number of (609)626-4684, and the name 'Santana' with a telephone number of (609)431-2044."[10]  (Id.; see also Ex. 4 to Gov't Opp'n.)[11]  In the presence of Detective Dorn, the confidential informant then dialed the number for "'Santana,'" 609-431-2044, and requested "'a box of doughnuts'" (i.e., an ounce of cocaine).  (Dorn Sept. 19, 2014 Aff. at ¶ 23.)  A voice which Detective Dorn recognized as the voice of Toye Tutis instructed CI #607/CS-2 to "call [his] brother."[12] (Id.)  CI #607/CS-2, in turn, placed a call to the number for "'Jewel,'" 609-626-4684, again in the presence of Detective Dorn, and requested a "'box of doughnuts.'"  (Id.)  The following day, August 6, 2014, CI #607/CS-2 met with Jewell Tutis (i.e., Defendant Tutis' brother) and completed the first in a lengthy series of controlled drug purchases.  (Id. at ¶ 24)

---

[9] The business card itself provides, on its face, only the contact information for "Toye."  (Ex. 4 to Gov't Opp'n.)
[10] The affidavit provides no detail concerning the source of the writing on the business card.  On the oral argument record, however, the Government explained that CI #607/CS-2 revealed, during a subsequent interview, that the source had inscribed the contact information on the business card.
[11] The business card itself does not specifically disclose the area code associated with these telephone numbers, but no party takes issue with Detective Dorn's inclusion of "609," the area code that, in any event, prevails in Atlantic City, New Jersey.
[12] In latter portions of his affidavit, Detective Dorn claimed that he had familiarity with the voice of Toye Tutis, as explained below.  (See Dorn Sept. 26, 2014 Aff. at ¶ 54.)

Aside from these early encounters, Detective Dorn detailed and recounted the additional drug involvement evidence against Jewell Tutis as provided by the confidential informant through subsequent recorded conversations,[13] and through additional controlled purchases. (See id. at ¶¶ 11, 20-48.) Indeed, the affidavit documents no fewer than nine completed drug transactions between CI #607/CS-2 and Jewell Tutis, all of which the ACPO affirmatively identified as drug substances through field tests.[14] (See, e.g., id. at ¶¶ 26, 28, 30, 34, 36, 39, 41, 44, 47, 52.)

As a result, Detective Dorn expressed his opinion that the evidence gathered at that time demonstrated probable cause that Jewell E. Tutis utilized the cellular device to communicate between co-conspirators in furtherance of an illicit narcotics distribution conspiracy, and that an electronic interception of the communications would enable the state investigators to (1) understand the nature of Jewell Tutis' relationship with his co-conspirators, (2) identify the suppliers of the controlled

_____

[13] These recorded conversations include a number of calls to Jewell Tutis, related to purchases of drugs, fraudulent drivers' licenses, and firearms. (See Dorn Sept. 19, 2014 Aff. at ¶¶ 24-53.)

[14] In its opposition, the Government claims that these controlled buys totaled "29 ounces of crack cocaine and 10 pounds of marijuana" from August 6, 2014 through September 30, 2014. (Gov't Opp'n at 16.)

substances, and (3) determine the location(s) of the drug substances and their proceeds.[15]  (See id. at ¶¶ 49-50.)

  After a few days of intercepting communications pursuant to the Jewell wiretap, Detective Dorn (and others) determined that Toye Tutis had used a specific cellular telephone in connection with his alleged drug distribution, 424-646-1761.  (See Dorn Sept. 26, 2014 Aff. at ¶¶ 3-5.)  As in the affidavit submitted in connection with the Jewell wiretap,[16] Detective Dorn acknowledged the wide scope of the investigation into Toye Tutis' drug activity, as well as the use of federal wiretaps that identified Toye Tutis as the target interceptee.  (See id. at ¶ 11.)  Nevertheless, Detective Dorn explained that the probable cause for "the present wiretap application" stemmed

---

[15] Judge DeLury authorized two extensions of this original wiretap authorization (BED-ATL-21-WT-2014X (October 9, 2014) and BED-ATL-21-WT-2014XX (October 17, 2014)), and on October 27, 2014, authorized a wiretap order designating Jewell Tutis as a leader of a drug trafficking organization.  (See Gov'ts Opp'n at 8.)  In sum, these electronic interceptions began on or about September 22, 2014 and continued through on or about November 24, 2014.  (See id.)

[16] The second affidavit of Detective Dorn restates and builds upon the evidence and information described in his first affidavit.  (Compare Dorn Sept. 19, 2014 Aff., with Dorn Sept. 26, 2014 Aff.)  In other words, in seeking the wiretap authorization against Toye Tutis, the ACPO continued to rely upon the confidential informant's statements concerning the initial meeting with Defendant Tutis in July 2014, as well as the contents of the recorded telephone call on August 5, 2014, and the subsequently completed drug transactions.  (See Dorn Sept. 26, 2014 Aff. at ¶¶ 21, 23.)

only from his state-based investigations,[17] including the evidence recited in the affidavit supporting the Jewell wiretap, together with the fact that the Jewell wiretap had captured conversations and text messages between Jewell and Toye allegedly concerning their attempts to obtain fraudulent drivers' licenses (and that supposedly confirmed Toye Tutis as the owner of the cellular telephone).[18]  (See id. at ¶¶ 54-55; see also Ex. A to Dorn Sept. 26, 2014 Aff. (line sheets of recorded telephone calls concerning fraudulent drivers' licenses).)

     As a result, Detective Dorn again expressed his belief that the evidence gathered at that time demonstrated probable cause

---

[17] In other words, Detective Dorn specifically declined to detail the fruits, if any, of the federal investigation, given the somewhat greater latitude afforded federal law enforcement in conducting investigations.

[18] As noted by Defendant Toye Tutis, these conversations did not, at least on the surface, delve into the acquisition of illegal narcotics, nor did they make mention of any controlled sales to the confidential informant (i.e., CI #207/CS-2). (See Tutis Br. at 5; see also Ex. A to Dorn Sept. 26, 2014 Aff.)  Rather, in the conversations most cited by the parties (i.e., call sessions 131 & 138 on September 24, 2014), a person believed to be Toye Tutis referenced the purchase of fraudulent California drivers' licenses to Jewell Tutis, and then stated that "' all [they] need[ed] to do [was] go in and open up boxes.'"  (Dorn Sept. 26, 2014 Aff. at ¶ 54.)  Despite the brevity of these exchanges, Detective Dorn explained how drug traffickers, in his experience, "utilize fraudulent out-of-state driver[s'] licenses to retrieve packages of suspected contraband through the United States mail." (Id.)  In that way, the affidavit of Detective Dorn plainly connects the conversation concerning fraudulent drivers' licenses to the overall allegations concerning Toye Tutis' alleged role in a drug trafficking operation.

that Toye Tutis continued to be involved in the sale of
controlled dangerous substances, and that an electronic
interception of the communications of his identified cellular
device would enable the state investigators to (1) further
understand the nature of Tutis' relationship with his co-
conspirators, (2) identify the suppliers of the controlled
substances, and (3) determine the location(s) of the drug
substances and their proceeds.  (See id. at ¶¶ 56-58.)  In view
of the contents of the affidavit, Judge DeLury issued the
requested wiretap on September 26, 2014 (BED-ATL-22-WT-14 & BED-
ATL-153-CDW-14) (hereinafter, the "Toye wiretap").[19]

> **C.  December 9, 2014 Search Warrants, December 10, 2014 Indictment, and Arrests**

On December 9, 2014, federal law enforcement agents
obtained federal search warrants for approximately seven
properties throughout southern New Jersey, all of which bore
some claimed relation to the alleged drug trafficking
organization.  (See Gov'ts Opp'n at 32; see also Walsh Affidavit
at ¶ 7.)

Then, on December 10, 2014, a federal grand jury returned a
two-count Indictment charging certain defendants with conspiring

---

[19] On the oral argument record, counsel for the Government raised
the prospect that Judge DeLury may have questioned Detective
Dorn on the contents of his affidavit in advance of his wiretap
authorization.  Nevertheless, the relevant record on the issue
of suppression contains no support for this assertion, and so
the Court has not considered it.

to traffic in cocaine, heroin, and crack cocaine, and select others with conspiring to conceal and/or disguise the proceeds of this unlawful activity. [See generally Docket Item 1.]  More specifically, and as relevant here, the Indictment charges Defendants Tutis and Atiba with perpetrating a drug-trafficking conspiracy in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (hereinafter, "Count I"), and then charges Defendants Tutis and Vega with perpetrating a money-laundering conspiracy in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(1)(B)(ii), and (h) (hereinafter, "Count II").

During the execution of the search and arrest warrants, officers seized additional evidence of drug trafficking and money laundering, including more than one kilogram of crack cocaine, lesser amounts of powder cocaine and heroin, eight firearms, two tasers, more than forty cellular telephones, a bulletproof vest, and in excess of $100,000 in cash. (See Gov'ts Opp'n at 32-33.)

Following arraignments, discovery, and pleas,[20] the pending motions followed.

---

[20] At this point, six of the indicted defendants have pleaded guilty to the drug trafficking conspiracy charged in Count 1. These defendants specifically consist of Kareem Taylor, Philip Horton, Talib Tiller, Ronald Douglas Byrd, John Wellman, and Francisco Rascon-Muracami.

## III. SEVERANCE MOTION OF KABAKA ATIBA

In seeking severance, Defendant Atiba takes the position that a consolidated trial would unfairly prejudice his interests, because the allegations against co-defendants concern an array of allegations and conduct without relation to the specific conduct charged against him. (See Atiba Br. at 5-7.) As a result, Defendant Atiba claims that a single presentation of this voluminous evidence would pollute the minds of the jury, invariably resulting in guilt by association. (See id.) Beyond this "spillover" risk, Defendant Atiba claims that this action favors severance as a matter of "common sense," because the remaining defendants may (1) "attempt" to point the finger of blame at a co-defendant, (2) call one of the co-defendants as a witness, and/or (3) otherwise present "irreconcilable and mutually exclusive" defenses. (Id. at 5-6.)

The Government opposes severance on the grounds that Defendant Atiba has not pinpointed any substantial prejudice nor shown that a consolidated trial would otherwise impinge upon his right to fair trial. (See Gov'ts Opp'n Br. at 79-92.)

For the reasons that follow, Defendant Atiba's motion for severance will be denied.

### A.   Standard of Review Applicable to Severance

The joinder of multiple defendants into a single trial aims "to promote economy and efficiency and to avoid a multiplicity

14

of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." Burton v. United States, 392 U.S. 123, 131 (1968). Federal Rule of Criminal Procedure 14(a), in turn, provides that, "[i]f the joinder of offenses ... in an indictment ... appears to prejudice a defendant or the government, the court may order separate trials of counts ... or provide any other relief that justice requires."[21]  FED. R. CRIM. P. 14(a).  In other words, the Rule permits severance where a joint trial presents a

---

[21] Defendant Atiba appears to claim, in a single sentence, that the Government improperly charged the defendants in a single case for drug-trafficking conspiracy and a money-laundering conspiracy, because the two Counts grow out of separate transactions. (See Atiba Br. at 5.)  Where, as here, the charging document contains multiple defendants and offenses, Federal Rule of Criminal Procedure 8(b) governs both the proper joinder of defendants and the proper joinder of offenses.  See United States v. Irizarry, 341 F.3d 273, 287 (3d Cir. 2003) (citation omitted).  Federal Rule of Criminal Procedure 8(b) generally permits the Government to charge a series of related defendants and offenses in a single indictment, so long as the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses."  FED. R. CRIM. P. 8(b). Stated differently, the offenses and defendants must have a "transactional nexus" or logical relationship.  Irizarry, 341 F.3d at 287 n.4 (citation omitted); see also United States v. Adens, Crim. No. 12-616, 2015 WL 894205, at *1 (E.D. Pa. Feb. 27, 2015) (explaining same).  The Counts at issue here easily meet this requirement, because each Count alleges that the charged defendants participated "in the same series of acts or transactions," and Count II specifically charges Defendants Toye Tutis and Vega with, in essence, conspiring to conceal and disguise the fruits of the drug-trafficking conspiracy charged in Count I.  For that reason, the Court finds the joinder of offenses and defendants permissible under Federal Rule of Criminal Procedure 8(b).

substantial risk of prejudice to the defendant, by "compromis[ing] a specific trial right of one of the defendants, or prevent[ing] the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539-40 (1993);[22] see also United States v. Urban, 404 F.3d 754, 775 (3d Cir. 2005) (internal quotation omitted) (explaining that severance should be granted, only where "clear and substantial prejudice [would result] in a manifestly unfair trial").

Nevertheless, a defendant bears a "heavy burden in gaining severance," United States v. Quintero, 38 F.3d 1317, 1343 (3d Cir. 1994), and must "pinpoint clear and substantial prejudice resulting in an unfair trial." United States v. Riley, 621 F.3d 312, 335 (3d Cir. 2010); see also United States v. McGlory, 968 F.2d 309, 340 (3d Cir. 1992) (same). This burden requires more than a showing that "severance [will increase] the defendant's chances of acquittal." McGlory, 968 F.2d at 340. Rather, "the question of prejudice hinges upon 'whether the jury will be able to compartmentalize the evidence ... in view of its volume and limited admissibility.'" United States v. Walker, 657 F.3d 160,

---

[22] In Zafiro, the Supreme Court identified three instances of prejudice sufficient to warrant severance: (1) a complex case involving many defendants with "markedly different" degrees of culpability; (2) a case where evidence of one defendant's guilt is admissible only against a co-defendant; and (3) a case where exculpatory evidence is inadmissible in the joint trial. 506 U.S. at 539. No party claims that this action falls within one of these paradigmatic scenarios.

170 (3d Cir. 2011) (quoting <u>United States v. Davis</u>, 397 F.3d 173, 182 (3d Cir. 2005)).

In applying these guideposts to a severance request, this Court must "balance the potential prejudice to the defendant against the advantages of joinder in terms of judicial economy." <u>See</u> <u>United States v. Sandini</u>, 888 F.2d 300, 305-06 (3d Cir. 1989), <u>cert. denied</u>, 494 U.S. 1089 (1990).

**B. Defendant Atiba Has Not Demonstrated the Need for Severance**

The Indictment at issue here charges Defendant Atiba with participating in a large, multi-jurisdictional drug distribution conspiracy. [<u>See</u> <u>generally</u> Docket Item 1.] As a result of these circumstances, Defendant Atiba premises his severance motion upon the belief that the jury will be unable to conceptually sever the evidence against him from the evidence against the remaining co-defendants, as well as offering his speculation concerning the various remaining defendants' trial strategies. (<u>See</u> <u>generally</u> Atiba Br. at 5-10.) Nevertheless, the Court finds no risk of prejudice, nor jury confusion, sufficient to warrant severance.

Indeed, any prejudice from a joint trial would be minimal, particularly because the Indictment alleges that Defendant Atiba and his co-defendants (all except Defendant Vega) engaged in a single drug-trafficking conspiracy. [<u>See</u> <u>generally</u> Docket Item

17

1.]  Importantly, acts committed by one co-conspirator in
furtherance of the conspiracy become admissible against all co-
conspirators.  See United States v. Hart, 273 F.3d 363, 370 (3d
Cir. 2001) (explaining that, "acts committed by one in
furtherance of the conspiracy were admissible against the
other"); United States v. Jannotti, 729 F.2d 213, 221 (3d Cir.
1984) ("[T]he declarations and acts of the various members, even
though made or done prior to the adherence of some to the
conspiracy, become admissible against all as declarations or
acts of co-conspirators in aid of the conspiracy.") (internal
quotation omitted).

Acts and statements of co-conspirators in furtherance of
the charged conspiracy are admissible even against a single,
severed defendant at trial, if the government satisfies Fed. R.
Evid. 801(d)(2)(E) by proffering evidence of the existence of
the conspiracy and the defendant's knowing membership in it.  In
that way, even if the Court granted severance, much, if not all,
of the evidence concerning his alleged conspirators could still
be presented as against him.[23]  See Hart, 729 F.2d at 370.  Any

---

[23] Similarly, even if the Government's evidence against Defendant
Atiba remains somewhat weaker than that against any of his co-
defendants (an argument Defendant Atiba seems to advance),
variation in the quantity of evidence provides no grounds for
severance.  See United States v. Eufrasio, 935 F.2d 553, 568 (3d
Cir. 1991) ("Neither a disparity in evidence, nor introducing
evidence more damaging to one defendant than others entitles
seemingly less culpable defendants to severance.").

"'evidentiary spillover'" would, in turn, be "'vitiated,'" and severance would "'rarely, if ever, be required.'"  Id. (quoting United States v. DeLuca, 137 F.3d 24, 36 (1st Cir. 1998)) (affirming a district court denial of a request for severance).

Beyond this, although Defendant Atiba raises the "common sense" prospect of inconsistent trial strategies, his arguments rest upon speculation, and fall far short of demonstrating the particularity required for purposes of severance.  Indeed, he provides no detail concerning the nature of any inconsistent defenses (see Atiba Br. at 9 (claiming that "the defenses of the codefendants will be inconsistent")), nor any identification of which co-defendants he might call as a witness (much less any assurance that they would actually testify).  (See Atiba Br. at 10 (stating that he may, if necessary, call co-defendants as witnesses at trial).)  Defendant Atiba likewise offers no preview of his trial strategy and how it could be unfairly thwarted by a joint trial.  Nevertheless, "finger-pointing and blame-shifting" alone do not call for severance, United States v. Voigt, 89 F.3d 1050, 1095 (3d Cir. 1996), nor do "bald assertions that co-defendants will testify."[24]  United States v.

---

[24] Rather, courts ordinarily consider four factors: "'(1) the likelihood of co-defendant's testifying; (2) the degree to which such testimony would be exculpatory; (3) the degree to which the testifying co-defendants could be impeached; [and] (4) judicial economy.'"  Davis, 397 F.3d at 182 (citation omitted).  A "defendant's claim that his co-defendants would testify on his

<u>Davis</u>, 397 F.3d 173, 182-83 (3d Cir. 2005) (internal quotation marks and citation omitted).  Defendant Atiba's positions here fall squarely within these parameters, and fail to make a case for severance.

The Court reaches a similar conclusion with respect to Defendant Atiba's position on the so-called "spillover prejudice."  (<u>See</u> <u>generally</u> Atiba Br. at 5-7.)  More specifically, the Court finds no reason to believe that a jury will be unable to conceptually separate the evidence against each defendant, nor that a limiting instruction would prove inadequate to cure any incidental prejudice.[25]  <u>See</u> <u>United States v. Williams</u>, No. 06-719-5, 2009 WL 1285519, at *2 (E.D. Pa. May 7, 2009) ("[The Court] can ensure [Defendant] will receive a fair trial because it will issue jury instructions directing the jury to consider the evidence separately as to each defendant and each count."); <u>United States v. Saferstein</u>, No. 07-557, 2009 WL 1046128, at *5 (E.D. Pa. Apr. 17, 2009) ("[Defendant's

---

behalf must," however, be supported by more than the defendant's "'declaration of [his co-defendants'] intent to testify.'"  <u>Id.</u> (quoting <u>United States v. Gonzalez</u>, 918 F.2d 1129, 1137 (3d Cir. 1990)).  Here, Defendant Atiba does not address these factors, nor has he pointed to any support in the record for his otherwise vague assertions.

[25] The Court will, as always in joint trials, instruct the jury to "'give separate individual consideration to each charge against each defendant.'"  <u>Hart</u>, 273 F.3d at 370 (finding such charge appropriate to diminish any prejudice).  This instruction will, in turn, amply cure any arguable risk of "spillover" onto a less-involved defendant, as Defendant Atiba claims to be.

argument] that severance is necessary since a jury will have a difficult time separating or ascertaining which evidence against him is meant to prove which set of charges is also overcome, since the Court is in a position to evaluate each situation should any occur and to respond appropriately with limiting instructions at trial, if necessary.").

Finally, the Court finds that concerns of judicial economy weigh heavily in favor trying Defendant Atiba together with his remaining co-defendants.  See Sandini, 888 F.2d at 305.  Indeed, a joint trial would "promote efficiency and serve the interest of justice by avoiding the scandal and inequity of inconsistent verdicts."  Zafiro, 506 U.S. at 537 (internal quotations marks and citation omitted); see also Eufrasio, 935 F.2d at 568–69 ("The public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy.").  In view of the overlapping evidence, and the substantial admissibility of the evidence as against each defendant, a separate trial would, by contrast, be a waste of judicial time and resources.  See United States v. Lacerda, No. 12–303, 2013 WL 3177814, at *7 (D.N.J. June 19, 2013) (noting that "separate trials with respect to the same charged conspiracy would be a significant waste of judicial time and resources because participants in a conspiracy should

21

ordinarily be tried together, even if the evidence against one is more damaging than it is against another").

   For all of these reasons, Defendant Atiba's severance motion will be denied.

## IV.  SUPPRESSION MOTION OF TOYE TUTIS

   In moving to suppress the wire and electronic conversations captured under the Toye wiretap, Defendant Tutis claims, as explained above, that the supporting affidavit in the Superior Court lacked probable cause, because it rested upon the uncorroborated account of an in-person conversation with Defendant Tutis, and a series of recorded calls and controlled drug purchases in which Tutis played no obvious role.  (See Tutis Br. at 7-9.)  For these reasons, Defendant Tutis submits that the fruits of the Toye wiretap should be suppressed.

   In the alternative, Defendant takes the position that Detective Dorn omitted material facts from his probable-cause affidavit, because although he acknowledged the parallel federal wiretaps (and investigation), he failed to inform Judge DeLury that the "intensive [parallel] investigation" produced (1) "no real evidence" of Tutis' involvement in any drug distribution, (2) no confirmation that he acted under the alias "'Santana'" (and instead claims that Jewell used that alias), (3) nor any verification of his voice on the August 5, 2015 telephone call. (Id. at 10-11.)  For these reasons, Defendant Tutis requests

that the Court convene a Franks hearing to address the alleged "omissions" with Detective Dorn, and to compare known samples of Defendant Tutis' voice with that captured in the August 5, 2014 recording.[26]  (Id. at 12.)

The Government opposes suppression, principally on the ground that Defendant Tutis' challenges fail to consider the probable-cause affidavit in its entirety.  (See Gov'ts Opp'n at 38-45.)  The Government similarly challenges Defendant Tutis' entitlement to a Franks hearing, on account of his failure to make a "substantial showing" of any intentional and/or reckless omission by Detective Dorn.  (Id. at 59.)  Indeed, the Government takes the position that Detective Dorn's affidavit contains no material omissions.  (See generally id. at 38-59.)

For the reasons that follow, Tutis' motion to suppress and/or for a Franks hearing will be denied.

---

[26] In Franks v. Delaware, the Supreme Court concluded that the Fourth Amendment requires a hearing, "where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and where "the allegedly false statement is necessary to the finding of probable cause."  438 U.S. 154, 155-56 (1978).  Thus, in simple terms, when a substantial preliminary showing has been made, a Franks hearing provides a defendant with an opportunity to take direct testimony from the affiant involved in the wiretap application, and then to submit additional argument on the issue of suppression (accounting for, or ignoring, the false statements and omissions).  See United States v. Heilman, 377 F. App'x 157, 193 (3d Cir. 2010) (explaining the Franks procedure).

A.    Defendant Tutis' Request for Suppression

    1. Standard for Suppression

The traditional Fourth Amendment principles that apply to property searches govern probable cause determinations under the federal and/or state wiretap statutes.  See United States v. Tehfe, 722 F.2d 1114, 1118 (3d Cir. 1983); see also 18 U.S.C. § 2518(3) (federal wiretap statute); N.J.S.A. § 2A:156A-10 (state wiretap statute).  Under these principles, a finding of probable cause requires a "'fair probability'" of criminal activity, based upon the totality of the circumstances.  United States v. Bond, 581 F.3d 128, 139 (3d Cir. 2009) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  Stated differently, the issuing court must "make a practical, common-sense decision" concerning whether the circumstances set forth in the supporting affidavit, "including the 'veracity' and 'basis of knowledge' of the persons supplying the hearsay information," demonstrate "a fair probability" that the authorization will result in evidence of a crime.  Id. at 238-39.

A reviewing court must afford great deference to the probable cause finding of an issuing court.  See United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001); United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993).  As a result, the probable cause determination of an issuing court will be upheld so long as the supporting documents provided a substantial basis

24

for the initial probable cause decision.[27]  See United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001); United States v. Jones,

---

[27] Title III of the Omnibus Crime Control and Safety Street Act of 1968 empowers a judge to enter an ex parte order to authorize interception of wire communications, if the judge determines on the basis of the facts submitted by the application that:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit [a drug-trafficking offense]; (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. §§ 2518(3)(a)-(d).  The New Jersey Wiretapping and Electronic Surveillance Control Act, which governed the wiretap at issue here, contains analogous provisions, and specifically authorizes the issuance of a wiretap, if the judge finds probable cause to believe that:

> a. [t]he person whose communication is to be intercepted is engaging or was engaged over a period of time as a part of a continuing criminal activity or is committing, has or had committed or is about to commit an offense as provided in section 8 of P.L.1968, c.409 (C.2A:156A-8); b. [p]articular communications concerning such offense may be obtained through such interception; c. [n]ormal investigative procedures with respect to such offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ; d. [e]xcept in the case of an application meeting the requirements of subsection g. of section 9 of P.L.1968, c.409 (C.2A:156A-9), the facilities from which, or the place where, the wire, electronic or oral communications are to be intercepted, are or have been used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by, such individual; e. [t]he investigative or law enforcement officers or agency to be authorized to intercept the wire, electronic or oral communication are qualified by training and experience to execute the interception sought; and f. [i]n the case of an application, other than a renewal or extension, for an order to intercept a communication of a person or on a facility which was the subject of a previous order authorizing interception, the application is based upon new evidence or information different from and in

994 F.2d 1051, 1055 (3d Cir. 1993).  This deferential standard
"does not mean that reviewing courts should simply rubber stamp"
the authorizing judge's conclusions," United States v. Tehfe,
722 F.2d 1114, 1117 (3d Cir. 1983) (citing United States v.
Ventresca, 380 U.S. 102, 108 (1965))), but it does counsel that
"resolution of doubtful or marginal cases ... be largely
determined by the preference ... accorded to warrants." United
States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993) (citing
Ventresca, 380 U.S. at 109).  In other words, the standard
encourages that slight doubts concerning the propriety of the
wiretap authorization be resolved in favor of the issuing court.
See generally id.

### 2. The Wiretap Evidence Will Not Be Suppressed

Defendant Tutis' request for suppression hinges, as
explained above, upon his position that (1) an uncorroborated
conversation between a confidential informant and Tutis and (2)
an unauthenticated recording, fall short of demonstrating a fair
probability that an interception of his telephone calls would
reveal evidence of a crime. (See Tutis Br. at 7.)  These
positions, however, ignore the vastness of the evidentiary

---

addition to the evidence or information offered to support the
prior order, regardless of whether such evidence was derived from
prior interceptions or from other sources.

N.J.S.A. § 2A:156A-10.

proffer set forth by Detective Dorn in his affidavit.[28]  Indeed, a review of the Dorn Affidavit in its entirety plainly demonstrates that Judge DeLury had a substantial basis for his probable cause determination.

In his affidavit, Detective Dorn describes, at the outset, the ACPO's over "twenty year[]" investigation of Defendant Tutis' alleged "high level" narcotics distribution, as well as his belief that Defendant Tutis "utilize[d] prepaid accounts" and frequently changed his number "as part of a deliberate effort to thwart detection by law enforcement." (Dorn Sept. 26, 2014 Aff. ¶¶ 13, 20.)

The affidavit then recounts, as described above, the specifics of an in-person meeting between Defendant Tutis and CI #607/CS-2, during which he directed CI #607/CS-2 to refer to him as "'Santana'" and to use "a series of code phrases" when contacting his brother, Jewell, to purchase drugs. (Dorn Sept. 26, 2014 Aff. at ¶ 21.)  Following this initial encounter, on August 5, 2014, CI #607/CS-2 produced a Ta'Ja Construction business card bearing contact information for "Jewel" and

_____

[28] Critically, Tutis does not challenge the reliability of the confidential informant, an individual whom Detective Dorn has utilized "on multiple occasions" to assist in the investigation against Tutis and found to be reliable.  (See, e.g., Dorn Sept. 26, 2014 Aff. ¶ 20.)

"Santana."[29]  (Id. at ¶ 23; see also Ex. 4 to Gov'ts Opp'n.)  CI

#607/CS-2 then dialed "Santana" at the number listed on the

business card (and in the presence of Detective Dorn), at which

time Defendant Tutis instructed CI #607/CS-2 to "call [his]

brother" for "doughnuts."[30]  (Dorn Sept. 19, 2014 Aff. at ¶23)

CI #607/CS-2, in turn, contacted Jewell, and completed a

controlled buy of cocaine on the following day.  (Id. at ¶ 24.)

The substance of these communications involving Defendant Tutis

then found further corroboration, time and again, by the

_____

[29] The Court recognizes that the business card refers to
Defendant Tutis' brother as "Jewel," rather than "Jewell."  (Ex.
4 to Gov'ts Opp'n.)  Nevertheless, in view of the consistency
between the remaining evidence presented in the affidavit of
Detective Dorn, this misspelling casts little, if any, doubt
upon the propriety of the Tutis wiretap.  Beyond this, on the
oral argument record, the Government clarified that CI #607/CS-2
inscribed the contact information on the business card, not
Defendant Tutis.  That the confidential source would have
misspelled "Jewell" as "Jewel" does not detract from probable
cause to believe that Toye Tutis told the confidential source to
contact "Jewell," that Toye's nickname was "Santana," and that
the confidential source made note of both names on the business
card.
[30] The Court finds no support for the notion that the affidavit
must fail because it contains no evidence definitively tying
Defendant Tutis to the August 5, 2014 recording.  (See Tutis Br.
at 8.)  Indeed, Defendant Tutis' position in this respect
entirely ignores Detective Dorn's own familiarity with his
voice.  In his affidavit, Detective Dorn claimed familiarity
"with the voice of Toye Tutis," identified that voice as "the
same voice heard" on the relevant cellular telephone, and
explained his participation in the recorded telephone call.
(Dorn Sept. 26, 2014 Aff. ¶¶ 21, 54.)  In that way, Detective
Dorn's own knowledge (coupled with that of the confidential
informant and other investigators) sufficiently evidences
Defendant Tutis' participation in the August 5, 2014 call, at
least for purposes of the Court's review of probable cause.

multiple controlled drug purchases involving Defendant Tutis'
brother, one of which occurred in the presence of Defendant
Tutis himself.  (See, e.g., id. at ¶¶ 21, 23, 26, 28, 30, 34,
36, 39, 41, 44, 47, 52.)  The fact that the litany of controlled
buys occurred in accordance with, and immediately following, CI
#607/CS-2's initial conversations with Defendant Tutis
demonstrates a sufficient basis upon which to find probable
cause.  See Heilman, 377 F. App'x at 193 (finding a call log and
a single controlled purchase sufficient to demonstrate probable
cause).

Beyond this, though, the affidavit retraces a number of
conversations and text messages between Defendant Tutis and
Jewell Tutis concerning fraudulent drivers' licenses (see Ex. A
to Dorn Sept. 26, 2015 Aff.), and it squarely presents the
belief that drug traffickers "utilize fraudulent out-of-state
driver[s'] licenses to retrieve packages of suspected contraband
through the United States mail."  (Dorn Sept. 26, 2014 Aff. at ¶
54.)  The substance of these conversations, in turn, created at
least a fair probability that the Tutis wiretap would capture
evidence of a drug conspiracy (particularly when coupled with
the interactions involving CI #607/CS-2).  See Heilman, 377 F.
App'x at 193 (citation omitted) (finding that "frequent contact
with drug distributors" creates a fair probability that the
search would result in evidence of a drug-related offense).

Against that backdrop, and in view of the deferential standard, this Court finds that Judge DeLury had a substantial basis to find that Detective Dorn's affidavit, viewed in its entirety, demonstrated a "'fair probability'" of Toye Tutis' involvement in criminal activity utilizing the subject communication device.  Bond, 581 F.3d at 139 (citation omitted). Defendant Tutis' request for suppression will, accordingly, be denied.[31]

**B. Defendant Tutis' Request for a <u>Franks</u> Hearing**

In the alternative to suppression, Defendant Tutis requests that the Court conduct a <u>Franks</u> hearings regarding alleged omissions in the wiretap affidavit.

**1. Standard for a <u>Franks</u> Hearing**

The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or the omission of material information) in a search warrant or wiretap affidavit. <u>Yusuf</u>, 461 F.3d at 383–84.  Nevertheless, "a presumption of validity" attaches to the affidavit underpinning a wiretap.  <u>See</u> <u>Franks</u>, 438 U.S. at 171.  For that reason, a defendant seeking a <u>Franks</u> hearing, as here, must make two "substantial preliminary showings:" <u>first</u>, "that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless

---

[31] As a result, the Court need not reach the parties' position on the application of a "good faith" exception to the statutory probable cause requirements.

disregard for the truth;" and <u>second</u>, "that the false statement

or omission was necessary to the finding of probable cause."

<u>United States v. Rigaud</u>, 684 F.3d 169, 173 (1st Cir. 2012)

(citing <u>Franks</u>, 438 U.S. at 155–56); <u>see also United States v.</u>

<u>Yusuf</u>, 461 F.3d 374, 383 (3d Cir. 2006) (applying the same

framework); <u>Heilman</u>, 377 F. App'x at 177 (following <u>Yusuf</u>, and

discussing the relevant framework in greater detail).  This

demonstration, however, requires "more than conclusory

statements that the affidavit contains false statements or

omissions." <u>Heilman</u>, 377 F. App'x at 177 (citations omitted);

<u>see also Yusuf</u>, 461 F.3d at 383 n.8 (citation omitted) ("[i]n

order to make this preliminary showing, the defendant cannot

rest on mere conclusory allegations or a 'mere desire to cross-

examine'"); <u>United States v. Taylor</u>, 154 F.3d 675, 680 (7th Cir.

1998) (same); <u>Franks</u>, 438 U.S. at 171 ("To mandate an

evidentiary hearing, the challenger's attack must be more than

conclusory....").  Rather, the "challenger must specifically

identify allegedly false statements or omissions in the

affidavit and provide a statement of reasons supporting the

argument," as well as "an offer of proof or ... a satisfactory

explanation for the absence of proof." <u>Heilman</u>, 377 F. App'x at

177 (citations omitted); <u>see also Yusuf</u>, 461 F.3d at 383 n.8

(citation omitted) (explaining that a defendant seeking a <u>Franks</u>

hearing "must present an offer of proof contradicting the

affidavit, including materials such as sworn affidavits or
otherwise reliable statements from witnesses").

### 2. Defendant Has Not Made the Substantial Showing Necessary to Obtain a <u>Franks</u> Hearing

In this case, Defendant Tutis' request for a <u>Franks</u> hearing
requires no complex inquiry, because he has made no showing
(much less a substantial showing) that Detective Dorn knowingly,
intentionally, and/or recklessly made a false statement, nor
that any arguable false statement provided a necessary ground
for the Tutis wiretap.  Indeed, although Defendant Tutis takes
exception to the manner in which Detective Dorn presented the
results of a parallel federal investigation, he ignores the fact
that Detective Dorn expressly disclaimed any reliance upon the
federal investigation in connection with his evidence on the
issue of probable cause.  (<u>See</u> Dorn Sept. 26, 2014 Aff. at ¶
11.)  In that way, any omission relative to that prior
investigation does not give rise to a <u>Franks</u> hearing, because
the pendency and results of the federal investigation had no
impact on Judge DeLury's ultimate probable cause determination.

Similarly, although Tutis rejects any association between
himself and the nickname "Santana," and to the lack of evidence
identifying him as the participation on the August 5, 2014
recorded call (an argument the Court, in any event, rejects for
the reasons stated above), he cites to no evidence demonstrating

that the connection proffered by Detective Dorn proved false. Rather, Defendant Tutis claims that Detective Dorn should have contextualized his affidavit, by explaining that someone other than Defendant Tutis may have gone by the nickname "Santana." Nevertheless, the law does not require probable cause affidavits to detail every possible fact.  Even more critically, though, the sequence of events recounted in Detective Dorn's affidavit – both recorded and otherwise – plainly portrayed Defendant Tutis as having at least some involvement in the claimed drug conspiracy.  Indeed, during the recorded conversation on August 5, 2014, Defendant Tutis told CI #607/CS-2 to "call [his] brother" for "doughnuts," and then Jewell Tutis, the brother of Defendant Tutis, provided CI #607/CS-2 with controlled substances in accordance with Defendant Tutis' initial instructions, and on no fewer than nine occasions.  (See generally Dorn Sept. 26, 2014 Aff.)

Finally, although Defendant Tutis makes much of the misspelling of "Jewel" on the Ta'Ja Construction business card, the affidavit provided no detail concerning who wrote on the business card, and the affidavit, in any event, amply presented the distinction/error in spelling to Judge DeLury.  (Compare id. at ¶ 22 (detailing the contact between CI #607/CS-2 and Jewell E. Tutis), with id. at ¶ 23 (describing the "business card with the name 'Jewel'").)

33

For all of these reasons, Defendant Tutis' "conclusory" statements of material omissions fail to make a case for a <u>Franks</u> hearing.  <u>Yusuf</u>, 461 F.3d at 383 n.8 (citation omitted); <u>Heilman</u>, 377 F. App'x at 177 (citation omitted).

**V.    CONCLUSION**

For all of these reasons, Defendant Tutis' motion to suppress and Defendant Atiba's motion for severance will be denied.  An accompanying Order will be entered.

**  March 8, 2016  **                          **  s/ Jerome B. Simandle  **
Date                                           JEROME B. SIMANDLE
                                               Chief U.S. District Judge

34